IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| USAA CASUALTY INSURANCE COMPANY, a/s/o ALEX AND AMY JACOCKS, | * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civ. No. MJM-22-218 |
| THE FIFTH FUEL OF VIRGINIA, LLC, | * * | |
| Defendant. | * * | |

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM ORDER**

USAA Casualty Insurance Company a/s/o Alex and Amy Jacocks ("USAA") filed this

subrogation action against The Fifth Fuel of Virginia, LLC ("Fifth Fuel") for damages arising from

a residential fire, and Fifth Fuel filed a third-party complaint against Wenbrooke Electric, LLC

("Wenbrooke"). This matter is before the Court on USAA's motion to exclude opinions of Fifth

Fuel's fire investigation expert, ECF No. 55, and Wenbrooke's motion for summary judgment,

ECF No. 54. The motions are fully briefed and ripe for disposition. No hearing is necessary. *See*

Loc. R. 105.6 (D. Md. 2023). For the reasons stated below, the Court will deny the motions.


I.    **BACKGROUND**

On October 3, 2020, a fire at the residence of USAA's insureds, Alex and Amy Jacocks,

in Frederick, Maryland (the "Property").

The Jacockses purchased the Property in 2017. Alex Jacocks Dep., ECF No. 54-7, at 8:9.

Shortly after the purchase, they contracted with Wenbrooke for electrical services. *Id.* at 24:6. In

relevant part, Wenbrooke installed CAT 5E ethernet cables at various points in the Property, including in the ceiling above the master bedroom. *Id.* at 24:7–12; 26:18. To install the ethernet cables, Wenbrooke cut holes in the ceiling and "fished" the cables through the attic. Wenman Dep., ECF No. 54-9, at 7:20–21, 60:9, 82:4–12. Wenbrooke Electric "left the ethernet cable[s] hanging from each plug" so the Jacockses could later install wireless internet access points. Alex Jacocks Dep. at 24:15–21. Mr. Jacocks later mounted a Wi-Fi extender in the ceiling. *Id.* at 24:18–24; SEA Report at 29.

John Wenman, the owner of Wenbrooke, testified that he installed ethernet cables at the Property in 2017. Wenman Dep. (ECF No. 54-9) at 8:1–20, 26:8–21. To do so, in relevant part, Wenman cut a hole in the ceiling of the master bedroom. *Id.* at 77:14–78:4. He did not observe any wring above the ceiling, *id.* at 94:20–95:3, and there was no interruption in the electrical service at the Property when Wenman cut the hole, *id.* 128:3–7. Wenman denied that he or any of his employees made improper splices in the branch circuit wiring. *Id.* 135:11–136:11.

On September 28, 2020, Fifth Fuel installed cellulose insulation in the attic. Am. Compl. ¶ 9; SEA Report, ECF No. 55-2, at 11. The fire occurred on October 3, 2020, originating in the attic above the master bedroom. Fifth Fuel Interrog. Resp., ECF No. 54-6, at 2; SEA Report at 11; Gregory Hine Report, ECF No. 55-4, at 5; Amy Jacocks Dep., ECF No. 58-4, at 35:12–21.

In its amended complaint, USAA alleges that Fifth Fuel was responsible for causing the fire. *See generally* Am. Compl., ECF No. 17. According to USAA, spliced electrical wiring—specifically, branch circuit wiring—was installed in the attic when an addition was built on the Property around 1980. *Id.* ¶ 10. USAA alleges that Fifth Fuel failed to identify or recognize the spliced wires as a potential hazard before installing the cellulose insulation, which Plaintiff alleges "completely covered the spliced connections." Am. Compl. ¶¶ 11–12.

In its third-party complaint, Fifth Fuel alleges that Wenbrooke improperly spliced the wires in the attic while installing Wi-Fi at the Property. Third-Party Compl., ECF No. 28, ¶ 7. Fifth Fuel's experts—fire investigator Aaron Redsicker and electrical engineer Robert Neary—investigated the fire and authored a joint report. SEA Report, ECF No. 55-2. In the SEA Report, they opine that Wenbrooke and Mr. Jacocks caused the fire by damaging the branch circuit wiring when cutting the ceiling to install the ethernet cables, "improperly connecting the damaged wiring, and using the improper type of Wi Fi ceiling mount that was not fire rated." SEA Report at 6–7. According to the SEA Report, the fire was ignited by heat generated from the damaged wiring. SEA Report at 6–7, 36.

Based on a photograph he received after the report was completed, Neary testified at his deposition that the location of the Wi-Fi extender, where Wenbrooke cut the hole in the ceiling, "may be a little different than what we thought." Neary Dep. at 23:4–24:10. He stated that the photograph provided "a better location" for the Wi-Fi extender. *Id.* at 24:21–23. Neary believed the extender was "in the area" of where he originally thought it was, although it "might not be" in that exact location. *Id.* 26:2–4. Neary conceded that he did not know, within a reasonable degree of certainty, who performed the improper splicing of the wire that caused the fire. *Id.* 28:10–30:17.

Redsicker, in his deposition, testified that he determined the location of the Wi-Fi extender based on information from USAA's expert, Charlie Camara, as well as the deposition testimony of Mrs. Jacocks about her observations after the fire started and examination of photographs taken of the damaged ceiling after the fire. Redsicker Dep., Jan. 4, 2024, ECF No. 58-3, at 29:22–30:3. He further testified, in part, that he concluded Wenbrooke damaged the branch circuit wiring because the tools used to cut the ceiling offered the only explanation as to why the wiring was

spliced. *Id.* at 63:3–20. Redsicker relied upon Neary to offer opinions as to other possible electrical causes of the fire. *Id.* at 65:21–22.

## II.  PENDING MOTIONS

USAA filed a motion to preclude Aaron Redsicker from testifying at trial. ECF No. 55. Specifically, USAA contends that Redsicker's opinions are not based on sufficient facts and data or a reliable methodology. *Id.* Fifth Fuel filed a response in opposition to the motion, ECF No. 58, and USAA filed a reply, ECF No. 61.

Wenbrooke separately filed a motion for summary judgment on Fifth Fuel's third-party complaint. ECF No. 54. In its motion, Wenbrooke argues that "there is no evidence to prove that the hole cut by Wenbrooke in 2017 was within the area of origin, that Wenbrooke cut the branch circuit wiring or that Wenbrooke performed improper splicing of the wiring." ECF No. 54 at 9. Fifth Fuel filed a response in opposition to the motion, ECF No. 59, and Wenbrooke filed a reply, ECF No. 60.

## III.  USAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

### A.  Standard of Review

District courts are tasked with making preliminary determinations as to the qualifications of experts and the relevance and reliability of their testimony. *See* Fed. R. Evid. 104(a) & 702; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229–30 (4th Cir. 2017). Courts act as gatekeepers "to protect the judicial process from 'the potential pitfalls of junk science,'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (quoting *United States v. Bonner*, 648 F.3d 209, 215 (4th Cir. 2011)), and are given wide latitude in this role. *See Kumho Tire*, 526 U.S. at 141.

The party seeking to admit expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011) (citation omitted). Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Supreme Court has identified a non-exhaustive list of guideposts to be considered in a *Daubert* analysis, including:

> (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community.

*Lins v. United States*, Civ. No. ELH-17-2163, 2024 WL 1604494, at *19 (D. Md. Apr. 12, 2024) (citing *Daubert*, 509 U.S. at 593–94). Importantly, the foregoing factors "do *not* constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts . . . . Those factors may or may not be pertinent in assessing reliability, depending on the nature of the

issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at

138 (citing *Daubert*, 509 U.S. at 591, 593).

### B.  Discussion

Fifth Fuel designated two experts to offer opinions as to the cause and origin of the fire at

issue: Aaron Redsicker, a fire investigator, and Robert Neary, an electrical engineer. *See* ECF No.

55-2. Redsicker and Neary co-authored a report reflecting their conclusions from the investigation

("SEA Report"). ECF No. 55-2.

The SEA Report states that methods employed in the investigation of the fire complied

with the requirements of the National Fire Protection Associate 921 Guide for Fire and Explosion

Investigations ("NFPA 921"). *Id.* at 6. NFPA 921 contains accepted methodological standards for

investigations into the cause and origin of fires. *See Fireman's Fund*, 767 F. Supp. 2d at 554

(finding that a fire investigator's opinion should be excluded where he does not follow the

procedures set out in NFPA 921) (citing *Bryte ex rel. Bryte v. Am. Household*, 429 F.3d 469, 478

(4th Cir. 2005), and *Fireman's Fund Ins. v. Canon U.S.A.*, 394 F.3d 1054, 1060 (8th Cir. 2005)).

NFPA 921 prescribes an application of the scientific method to fire investigations. *Id.* (citing

NFPA 921 4.1–4.5).

> A fire or explosion investigation may include all or some of the
> following tasks: a scene inspection or review of previous scene
> documentation done by others; scene documentation through
> photography and diagraming; evidence recognition, documentation,
> and preservation; witness interviews; review and analysis of the
> investigations of others; and identification and collection of data or
> information from other appropriate sources.

*Severn Peanut Co. v. Indus. Fumigant Co.*, No. 2:11-CV-14-BO, 2014 WL 1056991, at *2–3

(E.D.N.C. Mar. 17, 2014), *aff'd*, 807 F.3d 88 (4th Cir. 2015) (quoting NFPA 921 § 4.4.3.2). Thus,

in accordance with *Daubert*, NFPA 921 provides standards controlling the methods of the fire

investigation that have gained general acceptance in the relevant professional community.

The SEA Report concludes:

[1]     The fire originated in the attic space above the middle, east side area of the master bedroom.

[2]     Specifically, the fire originated above the drywall ceiling and the attic's old kraft faced fiberglass insulation, where Wenbrooke Electrical cut the hole and installed a homemade recessed Wi Fi ceiling mount.

[3]     The ignition scenario was identified as heat generated from the damaged branch circuit wiring that had been improperly connected with only wire nuts, which ignited its insulation, the 3D printed plastic Wi Fi ceiling mount, and old kraft faced fiberglass insulation. The fire then spread to the wood structural members and newly installed blown in cellulose insulation.

[4]     Responsibility for the cause of the fire was Wenbrooke Electric and the homeowner, as their actions of cutting into the ceiling and damaging the branch circuit wiring, improperly connecting the damaged wiring, and using the improper type of Wi Fi ceiling mount that was not fire rated.

[5]     Southland Insulators, Inc.[1] was eliminated as having been responsible for the fire.

SEA Report at 6–7.

USAA moves to exclude Redsicker's opinions regarding the location of the Wi-Fi extender

and the placement of the spliced branch circuit wiring underneath fiberglass insulation.

**1.      Location of the Wi-Fi Extender**

First, USAA argues in its motion that Redsicker's opinion as to the cause of the fire relies

on the location of the ceiling-mounted Wi-Fi extender being in "very close proximity" to the

spliced wires, where the fire started, but no evidence supports his theory as to the Wi-Fi extender's

---

1          Fifth Fuel is identified as Southland Insulators, Inc. in the report.

location. ECF No. 55 at 3. Redsicker opined that the fire originated above the master bedroom ceiling—specifically, "above [the] ceiling mounted Wi-Fi extender." SEA Report at 29. USAA argues this theory is based on speculation rather than sufficient facts and data and that there is photographic and testimonial evidence directly contradicting Redsicker's view of where the extender was located. ECF No. 55 at 10–12.

To determine the location of the Wi-Fi extender, Redsicker testified that he relied on: (1) USAA's expert, Charlie Camara, allegedly informing him during the joint fire scene inspection where the extender was located; (2) Mrs. Jacocks's testimony as to her observations at the time of fire; and (3) post-fire photographs showing the lengths and placement of wires in the area where the fire started. Redsicker Dep., Jan. 4, 2024, at 29:22–30:3.

USAA submits an affidavit from Charles Camara in support of its motion. ECF No. 55-9. Camara states:

> At the time of the scene examination . . . I did not know precisely where in the ceiling the WiFi expander was located at the time of the fire. . . . I knew that further investigation and research would be necessary to attempt to identify the exact location of the WiFi expander at the time of the fire.

*Id.* ¶¶ 4–5. Further, Robert Neary, Fifth Fuel's electrical engineering expert, testified at his deposition, "We were told there was a WiFi extender in the area [and] that nobody knew exactly where it was." Neary Dep. at 44:10–12. Thus, Redsicker's opinions would not be reliable if they were based solely on Camara's alleged identification of the Wi-Fi extender's location.

Critically, however, Redsicker testified that he relied upon burn patterns at the fire scene, photographs of the area of the fire origin, and the testimony of the Jacockses, the Property's occupants.[2] Redsicker Dep., Jan. 4, 2024, at 28:7–30:3. Specifically, Redsicker testified that the

---

[2]      The Jacockses were deposed on September 27, 2022. *See* ECF No. 58-4 (Amy Jacocks Dep. transcript); ECF No. 54-7 (Alex Jacocks Dep. transcript).

lengths and placement of wires visible in photos of the origin area were indicative of the Wi-Fi extender's location before the fire when considered in light of the testimony of Mrs. Jacocks. *Id.* at 28:7–30:3.

Mrs. Jacocks testified about how she discovered the fire. Amy Jacocks Dep. 35:12–21. She was in the kitchen when she heard a bang. *Id.* She then went to the bedroom and saw that the Wi-Fi extender was on the floor. *Id.* She looked up through the hole in the ceiling where the extender would have been and could see that the insulation was on fire. *Id.* During their investigation, the experts observed that the Wi-Fi extender was "melted and charred." Redsicker Dep., Nov. 21, 2023, ECF No. 58-2, at 6:20; *see also* SEA Report at 19, 23.

Redsicker's opinions regarding the location of the Wi-Fi extender are based on sufficient facts and data to be admissible. Redsicker testified that he relied upon his observation and analysis of burn patterns, review and analysis of photographs showing the lengths and placement of wiring in the origin area, and the testimony of Mrs. Jacocks as to her observations of the fire and the Wi-Fi extender after the fire started. His opinions were not based on speculation.

In support of its motion, USAA attaches an unsigned statement, purportedly authored by Mr. Jacocks. ECF No. 55-8. The statement includes a picture of the reconstructed ceiling, with a black "X" apparently marking where Mr. Jacocks believes the fire started. *Id.* The unsworn statement and photograph, without more, do not demonstrate that Redsicker's opinions are unreliable.

Accordingly, Redsicker may testify at trial regarding his conclusions about the location of the Wi-Fi extender.

### 2.     Location of Branch Circuit Wiring

Second, USAA argues that Redsicker's opinions as to the location of the spliced wires are not based on an appropriate methodology. ECF No. 55 at 12–14. The SEA Report states that

"improperly spliced" branch circuit wiring was located "underneath the . . . fiberglass insulation" in the attic and therefore was not visible to Fifth Fuel when it installed the cellulose insulation. SEA Report at 21. USAA contends that this theory is "unsupported and factually implausible." *Id.* at 12. According to USAA, Redsicker improperly speculated that the spliced wires were not visible to Fifth Fuel because they were located under fiberglass insulation and thereby failed to satisfy the standards set forth in NFPA 921. *Id.* at 9, 12–14.

In his deposition, Redsicker testified as to how he determined that the branch circuit wiring was placed underneath the fiberglass insulation. He testified that he inspected an area of the Property "that wasn't exposed to any fire damage," pulled up the insulation and observed "the electrical wiring was run underneath the fiberglass insulation . . . ." Redsicker Dep., Jan. 4, 2024, at 20:10–16. He did not, however, take a photograph of this area. *Id.* at 24:13. Instead, Redsicker relied on photographs of the fire origin area, which, in his opinion, demonstrated that the branch circuit wiring was located under the fiberglass insulation. *Id.* at 26:16–29:20. Photographs discussed at Redsicker's deposition are displayed and described in the SEA Report and depict wires and insulation. SEA Report at 24–25. Thus, Redsicker's opinions as to the placement of the branch circuit wiring underneath the fiberglass insulation are based on his personal observations during the inspection of the Property and his review and analysis photographs taken at the Property after the fire. The Court finds these methods to be reliable and compliant with NFPA 921 standards. *See Severn Peanut Co.*, 2014 WL 1056991, at *2–3 (NFPA 921 provides that fire investigation may include "scene documentation through photography and diagraming" and/or "a scene inspection or review of previous scene documentation done by others[,]" among other data collection tasks) (quoting NFPA 921 § 4.4.3.2).

USAA argues that at least one of the photographs on which Redsicker relied "demonstrates how the wires were strung over the fiberglass insulation and over the ceiling tresses." ECF No. 55 at 13. According to USAA, Redsicker "flat out misinterprets photographs" in concluding that the branch circuit wiring was undern the fiberglass insulation. *Id.* at 13–14. USAA further argues that, to support his theory, Redsicker should have torn out "an undamaged portion of the ceiling to photograph the layout of fiberglass insulation and wires he claims exists." ECF No. 55 at 13. Ultimately, however, Plaintiff fails to articulate any methodological standard that Redsicker violated in forming his opinion as to the placement of the branch circuit wiring. USAA's difference of opinion as to how the photographs at issue should be interpreted is not grounds to exclude an expert's testimony.

Accordingly, Plaintiff's motion will be denied, and Redsicker will be permitted to testify about the placement of the spliced wiring.

## IV.    WENBROOKE'S MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

A court may grant a party's summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis removed).

A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249.

## B. Discussion

Wenbrooke seeks summary judgment on the negligence claim asserted in Fifth Fuel's third-party complaint. Wenbrooke argues in its motion that "there is no evidence to prove that the hole cut by Wenbrooke in 2017 was within the area of origin, that Wenbrooke cut the branch circuit wiring or that Wenbrooke performed improper splicing of the wiring." ECF No. 54 at 9. Fifth Fuel contends that its experts' opinions and testimony are sufficiently based on direct and circumstantial evidence that Wenbrooke cut or spliced the wires at issue. ECF No. 59 at 3–4.

To establish negligence under Maryland law, a plaintiff must prove the following four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Lloyd v. GMC*, 916

A.2d 257, 270–71 (Md. 2007). A party may rely on circumstantial evidence to prove causation. *See Rafferty v. Weimer*, 373 A.2d 64, 67 (Md. Ct. Spec. App. 1977).

Fifth Fuel alleges that the fire was caused by Wenbrooke's defective electrical work. Third-Party Compl. ¶ 6.[3] Specifically, Fifth Fuel contends that Wenbrooke "improperly completed electrical work," "damaged the branch circuit wiring while cutting through the drywall," and "completed an improper splice of the branch circuit wiring." Fifth Fuel Interrog. Resp. Nos. 3, 23, 24. Fifth Fuel's experts' report concludes: "Responsibility for the cause of the fire was Wenbrooke Electric and the homeowner, as their actions of cutting into the ceiling and damaging the branch circuit wiring, improperly connecting the damaged wiring, and using the improper type of Wi Fi ceiling mount that was not fire rated." SEA Report at 7.

Wenbrooke contends that Neary's conclusions fail to rule out alternative causes of damage to the branch circuit wiring. ECF No. 54 at 12. "[T]he failure to consider potential alternative causes may render an expert's testimony inadmissible." *Purvis v. Bryant*, Civ. No. 9:17-01532-DCN, 2018 WL 6604231, at *2 (D.S.C. Dec. 17, 2018) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)). "However, an expert need not 'rule out every potential cause[,]'" *id.* (quoting *In re Fosamax Prod. Liab. Litig.*, 647 F. Supp. 2d 265, 278 (S.D.N.Y. 2009)), and a plaintiff "need not 'negative entirely the possibility that the defendant's conduct was not a cause[.]'" *Sanjeev Sirpal v. Fengrong Wang*, Civ. No. WDQ-12-0365, 2013 WL 5234256, at *4 (D. Md. Sept. 16, 2013) (quoting *Med. Mut. Liab. Soc. of Maryland v. B. Dixon Evander & Associates, Inc.,* 660 A.2d 433, 440 (1995).

---

[3]     The Third-Party Complaint actually states: "Third-Party Plaintiff [Fifth Fuel] alleges that the fire that occurred on the Jacocks' property on October 3, 2020 was the *cause* of defective and negligent wiring and work conducted by Third-Party Defendant, Wenbrooke Electric." Third-Party Compl. ¶ 6 (emphasis added). The Court assumes the word "cause" is an error and Fifth Fuel intended to allege that the fire was the *result* of Wenbrooke Electric's "defective and negligent wiring and work . . . ."

Here, Fifth Fuel presents sufficient circumstantial evidence to overcome Wenbrooke's summary judgment motion. Specifically, as reflected in the SEA Report, Redsicker and Neary concluded from their investigation that the fire originated in the area of where the Wi-Fi extender was installed, that the fire was ignited from heat generated from the damaged branch circuit wiring, and that Wenbrooke had damaged the branch circuit wiring when it cut into the ceiling and improperly installed the Wi-Fi ceiling mount. SEA Report at 6–7. Neary later testified, based on new photographs, that the Wi-Fi extender was not in the exact location he previously believed it was, but he still believed it was in the same area. Neary Dep. at 23:4–24:10, 26:2–4. Neary could only testify that it was possible that the Wi-Fi extender in the area of the fire's origin, *id.* at 27:6–15, stating further that he would "[p]robably" rely on Redsicker's opinion regarding the location of the Wi-Fi extender. Neary Dep. at 25:8–33. Redsicker, in turn, testified that the Wi-Fi extender was "quite close" to the origin, less than 12 inches away, Redsicker Dep., Jan. 4, 2024, at 5:8–23.[4]

Expert testimony offered by Fifth Fuel is sufficient to implicate Wenbrooke in the fire. Neary maintained that the improperly spliced wiring caused the fire, but, as Wenbrooke emphasizes, he could not opine within a reasonable degree of certainty who was responsible for the improper splicing. Neary Dep. at 28:3–22, 31:11–32:14. Still, Redsicker opined that Wenbrooke damaged the branch circuit wiring when it cut into the ceiling. Redsicker Dep., Jan. 4, 2024, at 63:3–16. Redsicker pointed out that equipment and tools used to cut the ceiling "would explain how those wires were damaged and why they needed to be repaired, though, they weren't repaired properly." *Id.* He further testified, based on the information he had at the time of his

---

[4]     Neary's reliance on Redsicker's opinion as to the Wi-Fi extender was not improper. "[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert . . . ." *Gray Constr., Inc. v. Medline Indus., Inc.*, Civ. No. SAG-19-03405, 2023 WL 121738, at *6 (D. Md. Jan. 6, 2023) (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)).

deposition, that Wesbrooke's error was the only explanation for the splices. *Id.* at 63:17–21. When asked, Redsicker was not able to rule out completely the possibility that the splices were made when the addition was originally constructed, but he opined that this was "very unlikely." *Id.* at 63:3–20. He explained, "it would be very easy to make a repair on a building that is under construction as opposed to after everything has been constructed and insulation laid and being confined to small spaces." *Id.* Ultimately, Redsicker testified that he would rely on Neary's opinion as to other potential electrical causes of the fire. *See id.* at 63:3–65:22. Again, "an expert need not rule out every potential cause." *Purvis*, 2018 WL 6604231, at *2 (cleaned up).

In sum, the Court finds the testimony of Redsicker and Neary sufficient to create a genuine dispute as to whether electrical work performed by Wenbrooke Electrical caused the fire at the Property. Wenbrooke's motion for summary judgment must be denied.

## V.   CONCLUSION

For the reasons stated herein, USAA's Motion to Preclude Testimony of Aaron Redsicker (ECF No. 55) is DENIED, and Wenbrooke's Motion for Summary Judgment (ECF No. 54) is DENIED.

It is so ORDERED.


   9/16/24                                                    /S/
Date                                          Matthew J. Maddox
                                              United States District Judge